SIGNED THIS: December 27, 2011

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RUSSELL D. ARMSTRONG, | ) | Case No. 10-82092 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| RUSSELL D. ARMSTRONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 10-8118 |
| | ) | |
| U.S. DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**O P I N I O N**

This matter is before the Court after trial on the adversary complaint brought by the Debtor, Russell D. Armstrong (DEBTOR), against the United States Department of Education (DEPARTMENT), pursuant to section 523(a)(8) of the Bankruptcy Code, seeking a determination that excepting his liability for educational loans would impose an undue hardship on him and his dependents.

There is no dispute regarding the basic facts of the case. The DEBTOR graduated from the University of Illinois with a Bachelor of Science Degree in marketing in 1973 and a Masters in Business Administration in 1974. Upon graduation, the DEBTOR held a number of jobs in the computer sales field, at steadily increasing salaries. From 1983 through 1991, the DEBTOR worked for Digital Equipment Corporation, as a sales representative, earning from $34,000 to $58,000 annually. Following a period of reduced earnings, the DEBTOR was employed from 1995 through 2002, by Ban-Koe Systems, Inc., as a sales representative for automated time and attendance systems, earning approximately $32,000 annually. When he lost that job, a noncompete clause in his contract with Ban-Koe prohibited him from selling a competitive time and attendance offering in any state in which they did business. Although he did not work in the ensuing year because of that restriction, he became an authorized Trak-Data Systems dealer and Optimum Solutions dealer in 2002, and the dispute with his former employer was resolved at the year's end. According to the DEBTOR, his earnings were minimal in the early years of the business.[1]

According to the joint tax returns filed by the DEBTOR and his wife, their earnings for the years 2006 through 2010, were as follows:

| Tax Year | Wages | Business Income | Adjusted Gross Income |
|---|---|---|---|
| 2006 | $26,711 | $9,551 | $38,495 |
| 2007 | 34,576 | 6,858 | 40,949 |
| 2008 | 35,583 | 15,569 | 50,052 |
| 2009 | 38,204 | 9,579 | 46,102 |
| 2010 | 38,479 | 9,042 | 44,382 |

---

[1] The DEBTOR listed his earnings from Optimum Solutions as $8,000 in 2002. He earned only $4,000 from both Trak-Data and Optimum in 2003 and 2004. In 2005, he reported earnings of $7,000 from Trak-Data only.

2

With the exception of $744 earned by the DEBTOR from teaching at Black Hawk College, all of the wages were earned by Marcella.[2] Marcella has been employed by WorldComm for many years and her job has provided the DEBTOR'S family with health insurance. Though it was feared that she would lose her job at the end of 2004, she survived her employer's downsizing.

The DEBTOR and his wife Marcella have three children. In order to pay for their daughters' college educations, the DEBTOR borrowed funds from the Federal Direct Loan Program through the Parent Loans for Undergraduate Students, referred to as "PLUS" loans.[3] The DEBTOR borrowed $18,125 for academic year 1998/1999 and $14,434 for academic year 2000/2001, to send their daughter Kristen to Indiana University in Bloomington. Those two loans were combined into a consolidated loan on September 4, 2001, by a new loan for $29,929. Later that month, the DEBTOR borrowed $16,254 for academic year 2001/2002. The DEBTOR managed to make the loan payments until he lost his job at Ban-Koe. In January, 2003, the DEBTOR applied for a deferment based upon his being unemployed, indicating that he either became unemployed or was working less than thirty hours per week as of January 10, 2002.[4]

In 2004, the DEBTOR and Marcella sold their house in Davenport, Iowa, and moved into a rental property in Moline, Illinois. On July 4, 2004, the DEBTOR applied for an economic hardship deferment request for the loans incurred on Kristen's behalf for a

---

[2] The DEBTOR earned $144 in 2008 and $600 in 2010.

[3] The purpose of the PLUS program was to encourage parents to bear their expected share of the student's educational costs rather than the student having to bear this burden through student borrowing. *In re Reid*, 39 B.R. 24 (Bankr.E.D.Tenn. 1984), citing 1980 U.S.Code Cong. & Admin.News, p. 3141.

[4] Although several applications for deferments were introduced into evidence by the DEPARTMENT, the record does not contain the exact terms and length of the deferments which may have been granted prior to the loans being consolidated.

3

twelve-month period beginning in June, 2004, indicating that his monthly income was only $467. In the fall of that year, the DEBTOR borrowed $7,393 for the academic year 2004/2005, to send his daughter Leanna to the University of Illinois at Urbana-Champaign. A deferment was again sought for the year beginning July, 2005. The DEBTOR borrowed $5,548 for the academic year 2006/2007. Just prior to making that August loan request, in June of that year, the DEBTOR sought an additional economic hardship deferment request for the year beginning July, 2006, based on his then monthly income of $553. The DEBTOR borrowed an additional $5,137 for the spring semester of that year. On May 24, 2007, the DEBTOR consolidated all his existing PLUS loans into a single loan with a balance of $75,888. Marcella was not an obligor on any of the loans, nor were either of their daughters.[5]

Deferment status was maintained on the consolidated loan until June, 2009. At that time, the balance of the loan was $86,240.90 and the DEPARTMENT notified the DEBTOR that he would be required to make 97 monthly payments of $1,039.36 beginning on July 7, 2009, with a final payment of $846.31 due on August 7, 2017. Because he was unable to make such a large payment, at the DEBTOR'S request, the DEPARTMENT changed the payments to a graduated schedule.[6] As revised, the DEBTOR was required to make payments of $475.13 beginning in July, 2009, for two years, with the payments increasing every two years up to $847.51 in the final year, with the last payment of $760.63 due in December, 2031. The DEBTOR made the first payment, in the amount of $475.13, in July,

---

[5] No student loans were taken out on behalf of the DEBTOR'S son, who attended junior college.

[6] A borrower may repay a Direct PLUS loan or a Direct PLUS Consolidation Loan under the standard repayment plan, the extended repayment plan, or the graduated repayment plan, in accordance with paragraphs (b), (d), and (f) of this section, respectively. 34 C.F.R. § 685.208(a)(1)(ii).

2009. Beginning the following month, through July 2010, the DEBTOR made monthly payments of $547.34.

The DEBTOR filed a Chapter 7 petition on July 1, 2010. His wife did not file. The schedules filed by the DEBTOR disclose that he owns no real estate and only minimal personal property, all of which is exempt. In addition to the education loan debt, the DEBTOR scheduled approximately $65,000 in unsecured credit card debt. The DEBTOR filed this complaint to determine the dischargeability of the educational loans. The DEBTOR was the only witness to testify at the trial held on September 29, 2011. Although both sides were given an opportunity to file briefs in lieu of closing argument, only the DEPARTMENT submitted a brief.

The DEBTOR, 64 years of age at the time of trial, testified that he had been able to make payments on the PLUS loans until he lost his position with Ban-Koe in early 2002. Prior to that time, he believed that he made about $18,000 in payments on the loans. The DEBTOR maintains that he has been in an active job search since 2002, to no avail.[7] He testified that both of his daughters obtained post-graduate degrees and that the student loans, which they obtained in order to do so, have now become due.[8] The DEBTOR and Marcella currently have three vehicles, all of which are fifteen years old. The DEBTOR testified that having three cars enables him to maintain them himself, by providing an extra vehicle until he can complete the necessary work. According to his testimony, both he and

---

[7] The DEPARTMENT questions whether the DEBTOR'S job search efforts have been adequate. Based on this Court's ruling, that question need not be resolved.

[8] The DEBTOR testified that Leanna had just completed her graduate degree. Testimony of whether either or both of their daughters were currently employed was not volunteered or elicited. In this Court's view, while neither daughter is legally obligated on the PLUS loan, to the extent they are able, they are under a moral obligation to pay their share of the debt incurred by their father for their benefit. It appears that Kristen did "loan" her father $8,250 prior to the filing of the petition.

5

Marcella have borrowed money from family members in order to meet their expenses and to make the payments on the PLUS loan. At the time the bankruptcy was filed, the DEBTOR owed Kristen $8,250 and his brother $1,900 for personal loans.

The DEBTOR testified that he and Marcella maintain a joint bank account and pay most of their bills from that account. Marcella maintains a separate account in her name from which she transfers funds to the joint account for that purpose. The DEBTOR acknowledged that frequent transfers were made from the Trak-Data account into the joint bank account and that on occasion, personal bills were paid directly from the Trak-Data account. From a review of the accounts made by the DEPARTMENT, transfers from the Trak-Data account totaled $16,965 in 2008, $18,345 in 2009, and $15,478 in 2010.

*ANALYSIS*

The discharge of student loan indebtedness in bankruptcy is governed by section 523(a)(8), which provides that an educational loan is not dischargeable in bankruptcy unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Because the Bankruptcy Code does not define the term "undue hardship," its interpretation is left to the courts and a split of authority at the circuit level has developed. The Seventh Circuit adopted the test set forth by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2nd Cir. 1987), in *Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993). To satisfy the *Brunner* test, the debtor must prove by a preponderance of the evidence that (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself or his dependants if forced to repay the loan; (2) the

state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and the debtor has made good faith efforts to repay the loans. *Brunner* requires that a debtor satisfy all three prongs of the test. If the debtor fails to establish any one requirement of the test, the inquiry comes to an end, and the student loan cannot be discharged. *Goulet v. Educational Credit Management Corp.*, 284 F.3d 773 (7th Cir. 2002).

One alternative rule of decision for determining an "undue hardship" is the totality of the circumstances test set forth in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702 (8th Cir. 1981) and reaffirmed in *Long v. Educational Credit Management Corp. (In re Long),* 322 F.3d 549 (8th Cir. 2003). In addition, the Tenth Circuit has adopted a modified version of the *Brunner* test, *Educational Credit Management Corp. v. Polleys,* 356 F.3d 1302 (10th Cir. 2004), where the court criticized the manner in which many courts have applied the *Brunner* test as too constrained and overly restrictive, resulting in denial of discharge "under even the most dire circumstances." *Id.* at 1308. After noting the lack of decision-making guidance offered by the totality of the circumstances test, the court concluded as follows:

> We do not read *Brunner* to rule out consideration of all the facts and circumstances. Under the first aspect of *Brunner,* the bankruptcy court is to inquire about whether the debtor can maintain a minimal standard of living while repaying the debt. This evaluation necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level. The second *Brunner* factor similarly requires an analysis of all the facts and circumstances that affect the debtor's future financial position. Finally, the good faith part includes an analysis of the debtor's situation in order to determine whether he has made a good faith attempt to repay the loan by maximizing income and minimizing expenses.
>
> We therefore join the majority of the other circuits in adopting the *Brunner* framework. However, to better advance the Bankruptcy Code's

> "fresh start" policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged. Additionally, we think that the good faith portion of the *Brunner* test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.

*Id.* at 1309.

The Seventh Circuit has indicated that for a hardship to be "undue," it must be more than mere "garden variety" hardship; "some major personal and financial sacrifices" are to be expected before hardship becomes undue. *In re O'Hearn,* 339 F.3d 559, 564 (7th Cir. 2003). In this Court's view, however, the Seventh Circuit and the Supreme Court would permit debtors who truly cannot afford to repay their educational loans to discharge them, since that appears to be the result intended by Congress.

A split of authority also exists on the issue of parents who obtain a loan not for their education but for that of their children. Under the majority view, the statute applies regardless of whether the debtor, as obligor on an educational loan, is the person who received the benefit of the loan. *In re Hamblin*, 277 B.R. 676 (Bankr.S.D. Miss. 2002)(collecting cases). The focus is on the type of "debt" not the type of "debtor." *In re Wells*, 380 B.R. 652 (Bankr.N.D.N.Y. 2007). These courts apply the plain language of the statute, which excepts from discharge "any debt" for an educational loan and makes no differentiation between student and non-student borrowers. *In re Vitzthum*, 2011 WL 3957273 (Bankr.W.D.Mo. 2011); *In re Norris*, 239 B.R. 247 (M.D.Ala 1999); *In re Stein*, 218 B.R. 281 (Bankr.D.Conn. 1998). A small number of courts have reached a contrary result which excludes non-student obligors from the reach of this provision, determining a literal

8

application of statute to be contrary to the expressed legislative intent of preventing recent graduates from discharging their educational loans. *In re Pryor*, 234 B.R. 716 (Bankr.W.D.Tenn. 1999); *In re Palmer*, 153 B.R. 888 (Bankr.D.S.D. 1993). Yet an equally important purpose of the statute was to protect the solvency of the student loan programs. *In re Hixson*, 450 B.R. 9 (Bankr.S.D.N.Y. 2011). This Court, following the weight of authority, has previously applied section 523(a)(8) to a PLUS loan, and that ruling has not been challenged by the DEBTOR here. *See In re Wilkinson-Bell*, 2007 WL 1021969 (Bankr.C.D.Ill. 2007); *See also In re Wills*, 2010 WL 1688221 (S.D.Ind. 2010); *In re Votruba*, 310 B.R. 698 (Bankr.N.D.Ohio 2004); *Hamblin*, 277 B.R. at 698.

It is fairly well established that as a general rule, the income of a non-debtor spouse who is not obligated on the educational loans, is material to the analysis. Nearly all courts that have considered the issue have held that it is appropriate to consider the financial circumstances of the debtor and the non-borrower spouse, as a family unit, in conducting an undue hardship analysis pursuant to section 523(a)(8). *In re Davis*, 373 B.R.241 (W.D.N.Y. 2007); *Educational Credit Management Corp. v. Waterhouse*, 333 B.R. 103 (W.D.N.C. 2005); *In re Gill*, 326 B.R. 611 (Bankr.E.D.Va. 2005); *In re White*, 243 B.R. 498 (Bankr.N.D.Ala. 1999)(collecting cases). Unusual facts may warrant an exception to the general rule. For instance, in *In re Halverson*, 401 B.R. 378 (Bankr.D.Minn. 2009), the court, noting the instability of the debtor's second marriage and the maintenance of their financial independence, departed from the rule including the spouse's income in the undue hardship analysis, determining it would be unfair to require the spouse to bear all of the living expenses in order that the debtor could devote his income to pay student loans which he

9

incurred years before the second marriage. In *In re Cumberworth*, 347 B.R. 652 (8th Cir.BAP 2006), the court held that the bankruptcy court did not err in ruling that the disability income of the nonborrower's spouse, who had recently been declared incompetent by the Veteran's Administration, would not be available to pay down the debtor's educational loans, absent specific authorization by the VA. *See also In re Innes*, 284 B.R. 496 (D.Kan. 2002)(income of nonborrowing spouse only considered to the extent of her proportionate share of family's basic living expenses, freeing up remainder to provide for reasonable expenses for six children).

In contrast to those exceptions, the facts of this case call for application of the general rule. Marcella and the DEBTOR have been life-long partners and, according to the DEBTOR, have operated as an economic unit. Kristen and Leanna, for whose benefit the educational loans were obtained, are the daughters of Marcella, as well as the DEBTOR. Not only did Marcella, who was the primary breadwinner throughout the period in question, benefit directly by escaping personal liability for the costs of her daughters' educational expenses, she has benefitted indirectly from the deferments which the DEBTOR obtained throughout the years. Given these circumstances, it is not unfair to consider Marcella's income in determining whether the DEBTOR and Marcella can maintain a minimal standard of living if the DEBTOR is forced to make payments on the educational loans.

*First Prong: Minimal Standard of Living*

Under the first prong of the *Brunner* test, the DEBTOR must show that he cannot maintain a minimal standard of living for himself and his dependents while repaying the

educational loan. Pertinent to this inquiry is whether the debtor is minimizing current household living expenses and maximizing personal income. *In re Neal*, 354 B.R. 583 (Bankr.D.N.H. 2006). Although the courts do not require a debtor to live in abject poverty, mere financial adversity is not sufficient.[9] *In re Hamilton*, 361 B.R. 532 (Bankr.D.Mont. 2007). Because the undue hardship determination rests upon the particular circumstances of each case, comparisons to the facts of other cases are of little assistance.

The first prong of the *Brunner* test demands a multifaceted, factually intense analysis, similar to determining a Chapter 13 debtor's monthly disposable income for plan payment purposes. Current actual income and expenses must be itemized so that monthly disposable income may be determined and compared with the amount of the monthly student loan payment. Where both husband and wife are jointly liable on the student loan, the analysis proceeds the same as would the determination of monthly net income using Schedules I and J, in a joint Chapter 13 case involving under median debtors. Where the debtor's spouse is not jointly liable, but earns income, however, the analysis is trickier and requires the exercise of judgment about how to allocate the family living expenses between the two incomes.

Generally, spouses are expected to provide financial support to each other. The first prong of the *Brunner* test requires the assumption that the DEBTOR is using his income to make the student loan payments. That may mean that his non-liable spouse is, as a result, supporting him with her income. For the reasons stated above, Marcella's income and her

---

[9]Some courts have turned to the IRS Standards recently incorporated into the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, for assistance in determining the reasonableness and necessity of a particular expenditure by the debtor. *See In re Miller*, 409 B.R. 299 (Bankr.E.D.Pa. 2009). This Court agrees with *Miller's* conclusion that while the means test numbers may provide a frame of reference, those expenses cannot be determinative. *See In re Vargas*, 2010 WL 5395142 (C.D.Ill. 2010).

11

personal expenses are thus properly taken into account when determining whether they, as a couple, can maintain a minimal standard of living if the DEBTOR is forced to use his income to repay the loans. Even though Marcella is not personally liable on the loans, since her husband is forced to use his income to pay the loans, and since she has an obligation to financially support him by virtue of the marriage, she may end up bearing the financial brunt of the loans to the same extent as if she was liable for them, at least hypothetically.[10] But for the reasons stated above, this Court does not consider that to be grossly unfair to her.

According to Schedules I and J submitted with the petition, which include Marcella's income and expenses, the DEBTOR'S household suffers a monthly deficit of $471.48, without considering any payment to the DEPARTMENT. DEBTOR'S Schedule I, the schedule of current income, reflects no income on his part, with the notation that his business, Trak-Data Systems, has shown a loss for the months preceding the filing of the petition. Marcella is shown as earning a net income of $2,195.73 from her primary job and net income of 566.79, from her part-time job, for a total monthly income of $2,762.52. Schedule J, the schedule of current expenditures, shows monthly household expenses of $3,233, including a payment of $250 for Marcella's debts. Other expenses listed include $750 for rent, $600 for food, $200 for clothing, $400 for transportation, and $300 for life insurance. The Debtor and Marcella owe approximately $4,500 in priority taxes which were not discharged in this bankruptcy.[11]

---

[10] It should be emphasized that the first prong analysis is a purely hypothetical exercise. The DEBTOR and Marcella are not living under the supervision of the bankruptcy court and may spend their money and arrange their financial affairs as they wish.

[11] The DEBTOR listed 2008 income taxes owing of $3,171 and 2009 taxes of $1,300. The DEBTOR testified that he is currently making payments on those obligations, which are nondischargeable.

12

The DEPARTMENT contends that Schedules I and J do not accurately portray the DEBTOR and Marcella's financial circumstances, for several reasons. First, Schedule I includes no income earned by the DEBTOR from his Trak-Data dealership. The DEPARTMENT maintains that the DEBTOR earns either $803.50 or $1,290 monthly, depending on whether his earnings are calculated from their income tax return or from the actual transfers made between his business account and his personal account. The DEPARTMENT contends that if the lower amount were added to their income as shown on Schedule I, the deficit shown on Schedule J would disappear and approximately $400 would be available for the payment of the DEBTOR'S PLUS loan.

This Court believes that a more accurate figure can be extrapolated for the DEBTOR'S net income, based on his 2010 income tax return. In calculating his business income on Schedule C, the DEBTOR takes a tax deduction of $1,433, for the business use of his home. This is not an actual cash expenditure and must be added back to his business income of $9,042. From this amount of $10,475, however, must be deducted the self-employment taxes of $1,277 generated by the DEBTOR'S income as well as an additional $1,000 in income tax. Adding in the $600 received from teaching at Black Hawk College that year, the DEBTOR'S average monthly income is $733, which takes the DEBTOR'S monthly disposable income out of the red to a positive $262, without any adjustment to the expenses listed on Schedule J.

The DEPARTMENT also contends that the amounts paid by the DEBTOR for premiums on two life insurance policies are not necessary and could be used for loan repayments. The DEBTOR testified that he had converted an existing life insurance policy

13

to two new policies: a term policy which expires upon the DEBTOR reaching age 70, which would pay a death benefit of $165,000; and a variable life insurance policy insuring his life until the age of 90 and paying a death benefit of $23,500. In this Court's view, the larger policy is not reasonably necessary. The DEBTOR'S children are all adults and no longer are dependent upon him for support. Marcella, should she survive the DEBTOR, has a retirement from her long-standing employment with Verizon (formerly WorldComm). Absent a specific allocation of the premium cost of $300 to each policy, the Court accepts the DEPARTMENT'S assessment that a cancellation of the larger policy would free up at least $200 per month to devote to payment of the PLUS loan.

In addition, the DEPARTMENT challenges several of the DEBTOR'S other household expenses as excessive. The DEPARTMENT contends that the monthly food expense of $600 is too high and that a combined expense for clothing, laundry and dry cleaning of $250 is not reasonable. This Court agrees that the DEBTOR'S monthly allocation of $600 for food for two exceeds the minimal standard mandated by the *Brunner* test and adopts the DEPARTMENTS' suggestions that expenses of $475 for food and $175 for clothing and laundry expenses are adequate. That adjustment frees up an additional $200 for payment of the educational loan. Taking into consideration the foregoing revisions to the DEBTOR'S income and expenses, the DEBTOR has $662 available to make payments on the PLUS loan.

The DEPARTMENT also contends that the DEBTOR'S family income should be adjusted to account for his eligibility to apply for social security benefits. No evidence was offered, however, as to the amount of the benefit the DEBTOR would be entitled to receive

14

or the differential in amount if he postpones the benefit until a later time. Moreover, no evidence was presented that the DEBTOR is now drawing social security benefits. The first prong requires a snap-shot view of the DEBTOR'S present, actual circumstances. Anticipated future changes are properly considered in the second prong of the analysis.

To complete the analysis of the first prong, the Court is required to assume that the DEBTOR will repay the consolidated loan in level monthly installments, thus necessitating a determination of the amount of the monthly loan payments. Ordinarily, for loans that are in repayment status, the actual terms that are in effect would dictate the monthly payment amount. Where a loan is in deferral status or is otherwise subject to being reamortized, the monthly payment determination is a judgment call. The debt balance and interest rate are established as a matter of contract, but a court may be required to choose a reasonable amortization period.

It should be emphasized that because the first prong of the *Brunner* test asks whether a debtor currently has the means to pay off the loan, the monthly payment amount must be sufficient to fully pay the balance with interest over a reasonable term. The fact that a debtor may be able to afford to pay a lesser monthly amount is not relevant to the first prong analysis. It is an all or nothing issue.

The DEPARTMENT calculates the required monthly payment by estimating a balance of $90,000, amortized over twenty years, resulting, it suggests, in a payment of $375 per month, noting that there would be "some" interest. The DEPARTMENT'S estimate is far too low. Amortized over 20 years at 7.5% interest, the monthly payment would be $725.03. Shortening the repayment term to fifteen years would result in a

Case 10-08118    Doc 25    Filed 12/27/11    Entered 12/27/11 14:32:14    Desc Main
               Document - Complaint    Page 16 of 19

payment of $834.31. Reducing the term to ten years would increase the payment to $1,068.32.

Although the issue is close, the DEBTOR'S monthly disposable income falls short of being enough to pay off the PLUS loans, even assuming maximum financial support from Marcella and even using a 20-year amortization, which, given the DEBTOR'S age, is unrealistically long. For the reasons indicated earlier, it makes no difference that the DEBTOR has the means to pay a portion of the loan balance, even a substantial portion, since the *Brunner* test mandates the assumption of full payment.

*Second Prong: Future Ability to Pay*

The first *Brunner* factor measures the debtor's *current* ability to make payments. Having determined that the DEBTOR lacks that ability, the Court now turns to the next factor, which addresses the likelihood that the DEBTOR'S inability to pay will continue for a significant portion of the repayment period. The second prong is by far the most difficult for courts to apply. The Eighth Circuit's decision in *Long* and the Tenth Circuit's decision in *Polleys* are reflective of that difficulty. On one hand, it is safe to say that the usual rule that exceptions to discharge are construed narrowly in favor of debtors does not apply to section 523(a)(8), which puts the burden on debtors to prove undue hardship. On the other hand, educational loans are not always excepted from discharge and the vagueness of the undefined undue hardship standard gives courts wide latitude to allow for discharge under the right circumstances.

The Seventh Circuit has attempted to flesh out the second prong indicating that the debtor must show his dire financial condition is likely to exist for a significant portion of

the repayment period, and that dischargeability should be based upon a certainty of hopelessness that requires evidence of additional, exceptional circumstances, strongly suggestive of a continuing inability to repay over an extended period of time. *Goulet,* 284 F.3d at 778 (citing *Roberson,* 999 F.2d at 1135-36). Generally, the more time that has passed since the educational loan became payable, the easier it is for a debtor to pass the second prong of the test. In the absence of some reason to expect change, a lengthy history of financial struggles is a valid indicator of more of the same. *See Roberson,* 999 F.2d at 1138 (approving a two-year deferment, the court suggested that if his circumstances did not improve in two years, the debtor could reopen his bankruptcy case to have the dischargeability issue revisited).

The PLUS loans became payable about eight years ago. The DEBTOR recently turned 65 years of age. He is now eligible to receive social security benefits. No evidence was introduced, however, of the amount of the expected monthly payment. Even if he elects not to receive the payments for a year or two, he will soon start receiving the benefits. His financial situation will thus certainly and significantly improve in the near future, at which time he should be able to afford to make full monthly payments on the PLUS loans. This assumes, of course, that he continues to work and earn substantially the same income as in recent years. There was no evidence presented of poor health or other evidence to the contrary. Since the DEBTOR bears the burden of proof and he offered no contrary evidence, the Court finds that the DEBTOR is, or soon will be, eligible to receive a monthly social security payment, whereupon he will have the ability to pay the student loan balance based on a reasonable amortization. Although the size of his expected social

17

security payment is not in the record, it is likely large enough to enable payment based on a 15-year, or even a 10-year, amortization if he devotes the entire payment to the loans. This assumes that Marcella continues to work and that her income remains stable for the foreseeable future – here again, there was no evidence to the contrary. Although the DEBTOR may have to suffer the substantial hardship of using most or all of his income to pay the PLUS loans well into his normal retirement years, that is the result of obligating himself on the loans later in life, and is generally considered not to be a sufficient basis, by itself, to determine the hardship to be undue. The Court determines that the DEBTOR has failed to carry his burden to prove the second prong of the *Brunner* test. It is thus not necessary to consider the third prong.

*Conclusion*

As the Seventh Circuit recognized in *Roberson* and this Court recognized in *In re Himes*, 2001 WL 34076414 (Bankr.C.D.Ill. 2001), the determination that a debtor has failed to pass the *Brunner* test on an educational loan, is time sensitive.[12] Other courts agree that a debtor, having previously lost an undue hardship determination, may seek a new determination by filing an adversary complaint based upon a change in circumstances. *In re Smith*, 442 B.R. 550 (Bankr.S.D.Tex. 2010); *Educational Credit Management Corp. v. Jones*, 1999 WL 1211797 (E.D.Va. 1999); *In re Conner*, 89 B.R. 744 (Bankr.N.D.Ill. 1988); *In re Sobh*, 61 B.R. 576 (E.D.Mich. 1986); *see In re Walker*, 427 B.R. 471 (8th Cir.BAP. 2010)(Bankruptcy Code treats undue hardship as a "fluid concept"). The ability of a student loan debtor to

---

[12]This Court recognizes the possibility that the DEBTOR will not complete the payments on the consolidated PLUS loan. Some courts, forsaking an "all-or-nothing" approach, have granted partial discharge of student loans. *In re Hornsby*, 144 F.3d 433 (6th Cir. 1998). This Court does not believe that it has the authority to partially discharge a student loan obligation.

18

revisit the undue hardship issue in the future reflects the fact that courts do not have a crystal ball and are poor predictors of the future. Predicting what a particular individual's financial circumstances will be in five or ten or fifteen years is nothing more than guesswork.[13]

The Court recognizes the possibility that the DEBTOR will be paying on the nondischargeable debt for all or most of the rest of his life.  Under the totality of circumstances test, it could be concluded that these circumstances constitute a hardship that is undue.  However, the more restrictive *Brunner* test does not clearly admit such an exception.  Given the DEBTOR'S age of 65, if the loans were older, a finding of undue hardship would likely be warranted.  In this Court's view, the loans are of too recent a vintage to permit the DEBTOR'S age to control the dischargeability determination. Accordingly, the complaint filed by the DEBTOR seeking a determination that excepting his liability for the consolidated PLUS loans from discharge would impose an undue hardship on him and his dependents will be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

### 

---

[13]Congress could solve this problem, for example, by amending section 523(a)(8) to provide that student loans are not dischargeable for a set period, say fifteen years, unless the debtor is permanently disabled, and thereafter are dischargeable unless the creditor proves an immediate ability to pay. The dischargeability of student loans is primarily a question of policy that is for Congress to determine.  The judicially created *Brunner* test is not a source of Congressional policy.  The vagueness of section 523(a)(8) fosters litigation and inconsistency of results.  The student loan market has changed dramatically and section 523(a)(8) is in need of updating.